**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Blackstone v. Moore,* **Slip Opinion No. 2018-Ohio-4959.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-4959

BLACKSTONE ET AL., APPELLANTS, *v.* MOORE ET AL., APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Blackstone v. Moore,* Slip Opinion No. 2018-Ohio-4959.]**

*Marketable Title Act—R.C. 5301.47 et seq.—A reference in a deed to an oil-and-gas royalty that includes the type of interest created and to whom the interest was granted is sufficiently specific to preserve the interest in the record title.*

(No. 2017-1639—Submitted July 17, 2018—Decided December 13, 2018.)

APPEAL from the Court of Appeals for Monroe County,

No. 14 MO 0001, 2017-Ohio-5704.

_____

**DEWINE, J.**

**{¶ 1}** Ohio's Marketable Title Act generally allows a landowner who has an unbroken chain of title to land for a 40-year period to transfer title free of any interests that existed prior to the beginning of the chain of title. Under the act, however, an earlier-created interest is preserved if sufficient reference is made to

the interest within that chain of title. The question we must answer is what type of reference is sufficient to preserve that interest.

{¶ 2} The landowners here seek to extinguish an oil-and-gas royalty interest created in 1915. A deed in their chain of title references the royalty interest as well as the original holder of the interest. The landowners argue that this reference is not sufficient to preserve the interest because it does not include either the volume and page number of the record in which the interest is recorded or the date on which the interest was recorded. We conclude that the plain language of the act does not require such specificity. We therefore affirm the court of appeals' decision that the landowners' title remains subject to the royalty interest.

## I. BACKGROUND

{¶ 3} In 1915, Nick and Flora Kuhn conveyed a 60-acre tract of property to W.D. Brown and his wife. The Kuhns reserved a royalty interest in the property by including the following language in the deed (the "Kuhn deed"): "Except Nick Kuhn and Flora Kuhn, their heirs and assigns reserve one half interest in oil and gas royalty in the above described Sixty (60) acres." Each succeeding conveyance of the property included language excepting the Kuhn royalty interest. Alfred Carpenter conveyed the property to David Blackstone in 1969, and as with the past conveyances, the deed included language about the royalty-interest reservation: "Excepting the one-half interest in oil and gas royalty previously excepted by Nick Kuhn, their [sic] heirs and assigns in the above described sixty acres." Nine or ten years later, Blackstone attempted to purchase the royalty interest from the Kuhn heirs, but negotiations failed. In 2001, Blackstone conveyed the property to himself and his wife Nicolyn Blackstone, again including the language excepting the royalty interest.

{¶ 4} In 2012, the Blackstones filed a complaint against the Kuhn heirs, seeking to quiet title and a declaration that the oil-and-gas royalty interest reserved in the Kuhn deed had been abandoned under the former and current versions of the

2

Dormant Mineral Act, R.C. 5301.56. Later, the Blackstones amended the complaint to seek a declaration that the rights also had been extinguished under the Marketable Title Act, R.C. 5301.47 et seq.

{¶ 5} The trial court granted summary judgment in favor of the Blackstones with regards to both the former version of the Dormant Mineral Act and Marketable Title Act claims, concluding that the Kuhns' royalty interest was extinguished under both acts. The Kuhn heirs appealed to the Seventh District Court of Appeals, which reversed the judgment of the trial court as to both claims.[1] 2017-Ohio-5704, 94 N.E.3d 108. Regarding the Marketable Title Act, the court concluded that the royalty interest had been preserved by the reservation language in the 1969 deed. *Id.* at ¶ 39.

{¶ 6} The Blackstones appealed, and we accepted jurisdiction over two propositions of law:

I. The specific identification contemplated in R.C. 5301.49(A) requires sufficient reference that a title examiner may locate the prior conveyance by going directly to the identified conveyance record in the recorder's office *without checking conveyance indexes*.

II. The exception to a person's marketable record title under R.C. 5301.49(A) does *not* include interests and defects, created by a recorded title transaction prior to the root of title, of which the person has *actual knowledge*, if the reference to such recorded title transaction is general rather than specific.

---

1. With respect to the Dormant Mineral Act, the court of appeals concluded that the current version of the act applied, that the Kuhn heirs had acted to preserve their interests, and that therefore the Kuhn interest could not be deemed abandoned under the act. The Blackstones do not challenge this conclusion.

(Underlining sic.)  *See* 152 Ohio St.3d 1406, 2018-Ohio-723, 92 N.E.3d 878.

## II.  ANALYSIS

### A.  The Marketable Title Act

{¶ 7} The Marketable Title Act was enacted to "simplify[] and facilitat[e] land title transactions by allowing persons to rely on a record chain of title."  R.C. 5301.55.  Thus, the act provides that a person "who has an unbroken chain of title of record to any interest in land for forty years or more, has a marketable record title to such interest."  R.C. 5301.48.  The marketable record title "operates to extinguish such interests and claims, existing prior to the effective date of the root of title."  R.C. 5301.47(A).  (A "root of title" is "that conveyance or other title transaction in the chain of title of a person * * * which was the most recent to be recorded as of a date forty years prior to the time when marketability is being determined."  R.C. 5301.47(E).)  The act facilitates title transactions, as the record marketable title "shall be taken by any person dealing with the land free and clear of all interests, claims, or charges whatsoever, the existence of which depends upon any act, transaction, event, or omission that occurred prior to the effective date of the root of title."  R.C. 5301.50.

{¶ 8} Balanced against the desire to facilitate title transactions is the need to protect interests that predate the root of title.  To this end, the act provides that the marketable record title is subject to interests inherent in the record chain of title, "provided that a general reference * * * to * * * interests created prior to the root of title shall not be sufficient to preserve them, unless specific identification be made therein of a recorded title transaction which creates such * * * interest."  R.C. 5301.49(A).  It is the operation of this section that is at issue in this case.

### B.  The 1969 Deed Sufficiently Identifies the Royalty Interest

{¶ 9} The Blackstones' root of title is the 1969 deed conveying the property from Carpenter to Blackstone.  They argue that the reference in the 1969 deed to

the Kuhn royalty interest—"[e]xcepting the one-half interest in oil and gas royalty previously excepted by Nick Kuhn, their [sic] heirs and assigns in the above described sixty acres"—is not sufficiently specific to preserve the interest. Thus, the Blackstones maintain that their title is not subject to the interest. The question is what makes a reference to an interest sufficient to preserve that interest under the Marketable Title Act.

{¶ 10} The Blackstones urge us to create a bright-line rule prescribing what must be included in such a reference. They suggest that we require that a reference include the volume and page number of the record of the instrument that created the interest. Alternatively, they say that we should require, at the very least, a reference that includes the names of the grantor and the grantee and the date on which the instrument was recorded. The Blackstones contend that such a rule would be consistent with the act's purpose of simplifying title transactions, as it would shorten the length of time required to track down interests.

{¶ 11} To answer the question before us, we look to the plain language of R.C. 5301.49:

> Such record marketable title shall be subject to
>
> (A) All interests and defects which are inherent in the muniments of which such chain of record title is formed; provided that a general reference in such muniments * * * to * * * interests created prior to the root of title shall not be sufficient to preserve them, unless specific identification be made therein of a recorded title transaction which creates such * * * interest.

The statute thus starts with a limitation making title subject to all "interests and defects" in the muniments of the chain of title. (A deed constitutes "a muniment within the record marketable title." *Toth v. Berks Title Ins. Co.*, 6 Ohio St.3d 338,

341, 453 N.E.2d 639 (1983).) The initial limitation is then qualified by the provision that a "general reference" to an interest is not sufficient unless that "general reference" includes "specific identification" of the "recorded title transaction" that created the interest.

{¶ 12} The statute presents a three-step inquiry: (1) Is there an interest described within the chain of title? (2) If so, is the reference to that interest a "general reference"? (3) If the answers to the first two questions are yes, does the general reference contain a specific identification of a recorded title transaction? Here, the answer to the first question is yes: the 1969 deed that constitutes the root of title recites that it is subject to the royalty interest. Thus, we turn to the second question: is the reference a "general reference"?

{¶ 13} Because the term "general reference" is not defined in the act, we look to the ordinary meaning of the term. *Stewart v. Vivian*, 151 Ohio St.3d 574, 2017-Ohio-7526, 91 N.E.3d 716, ¶ 26. "General" is defined as "marked by broad overall character without being limited, modified, or checked by narrow precise considerations: concerned with main elements, major matters rather than limited details, or universals rather than particulars: approximate rather than strictly accurate." *Webster's Third New International Dictionary* 944 (2002).

{¶ 14} Our caselaw distinguishes between a general reference and a specific reference: if a reference is specific, it is not a general reference. *See Toth*, 6 Ohio St.3d at 341, 453 N.E.2d 639. "Specific" is defined as "characterized by precise formulation or accurate restriction (as in stating, describing, defining, reserving): free from such ambiguity as results from careless lack of precision or from omission of pertinent matter." *Webster's Third New International Dictionary* at 2187.

{¶ 15} The reference to the Kuhn royalty interest includes details and particulars about the interest in question. And the interest is accurately referenced. Moreover, the reference is "free from * * * ambiguity." *Id*. The exception that is noted in the 1969 deed includes information about the type of interest created—

6

"one-half interest in oil and gas royalty" and specifies by whom the interest was originally reserved—"Nick Kuhn, their [sic] heirs and assigns." There is no question which interest is referenced in the 1969 deed. Thus, it is a specific reference. Because the reference to Kuhn heirs was not a general reference, there is no need to proceed to the third question—that is, whether a general reference contains a specific identification of a recorded title transaction.

{¶ 16} Much of the Blackstones' argument that the reference is insufficient is premised upon policy justifications for reading into R.C. 5301.49(A) a requirement that a reference include either the volume and page number where the interest was created or the date that the interest was recorded. They cite the burden of lengthy title searches, pointing out that to locate the Kuhn royalty interest, an examiner would have to review 11 or 12 volumes of conveyance indexes. But notably, the Blackstones do not suggest that the language used in the 1969 deed made it impossible to find the original exception. They would be hard pressed to do so, as they in fact located the 1915 deed with the original language. Indeed, we have declined to view the act's purpose as solely to limit the length of time required for title searches. *Heifner v. Bradford*, 4 Ohio St.3d 49, 53, 446 N.E.2d 440 (1983), fn. 4. As one commentator put it shortly after the act was passed, "The Act is designed to assure a reasonable title search, not to serve as a cure-all for title matters." Smith, *The New Marketable Title Act*, 22 Ohio St. L.J. 712, 717 (1961).

{¶ 17} The Blackstones' policy arguments regarding specificity are best directed to the legislature. That body, if it desired, could ordain that an interest created prior to the root of title is preserved only if a reference is made to the volume and page number where the interest was created. The legislature did just that in the Dormant Mineral Act when it provided that notice to holders of mineral interests must include the "volume and page number of the recorded deed or other recorded instrument under which the owner of the surface of the lands claims title or otherwise satisfies the requirements established in [R.C. 5301.52(A)(3)]." R.C.

5301.56(F)(2). Our role is to apply statutes as they are written, and nowhere does the Marketable Title Act require reference to the volume and page number or the date that the interest was recorded.

### III. CONCLUSION

{¶ 18} We reject the Blackstones' first proposition of law and hold that a reference that includes the type of interest created and to whom the interest was granted is sufficiently specific to preserve the interest in the record title. The court of appeals therefore correctly held that the Kuhn royalty interest was preserved. Because our rejection of the Blackstones' first proposition of law is dispositive, we need not consider their second proposition.

Judgment affirmed.

O'CONNOR, C.J., and O'DONNELL, KENNEDY, FRENCH, and FISCHER, JJ., concur.

DEGENARO, J., concurs, with an opinion.

_____

**DEGENARO, J., concurring.**

{¶ 19} I concur in the judgment and opinion of the court. However, I write separately to emphasize the narrow scope of our holding, which is simply that under the Marketable Title Act, R.C. 5301.47 et seq., "a reference that includes the type of interest created and to whom the interest was granted is sufficiently specific to preserve the interest in the record title," majority opinion at ¶ 18. Although this case happens to involve a mineral interest—more specifically, an oil-and-gas royalty interest—the result we have reached did not hinge on the nature of the interest. Therefore, our opinion should not be read to implicitly hold that the more general Marketable Title Act continues to apply to mineral interests following the enactment of the Dormant Mineral Act, R.C. 5301.56—a more specific statute providing for the termination of those interests.

**{¶ 20}** I question the Marketable Title Act's continued applicability in the context of this specialized real-property interest. On this point, the review of the evolution of the Marketable Title and Dormant Mineral Acts set forth in *Corban v. Chesapeake Exploration, L.L.C.*, 149 Ohio St.3d 512, 2016-Ohio-5796, 76 N.E.3d 1089, is instructive:

> When initially enacted, the Marketable Title Act did not "bar or extinguish any right, title, estate, or interest in and to minerals, and any mining or other rights appurtenant thereto or exercisable in connection therewith." Former R.C. 5301.53(E), 129 Ohio Laws [1040] 1046. However, the General Assembly amended former R.C. 5301.53 and former R.C. 5301.56 in 1973 "to enable property owners to clear their titles of disused mineral interests." Am.S.B. No. 267, 135 Ohio Laws, Part I, 942-943. Thus, the Marketable Title Act extinguished oil and gas rights by operation of law after 40 years from the effective date of the root of title unless a saving event preserving the interest appeared in the record chain of title—i.e., the interest was specifically identified in the muniments of title in a subsequent title transaction, the holder recorded a notice claiming the interest, or the interest "[arose] out of a title transaction which has been recorded subsequent to the effective date of the root of title." R.C. 5301.48 and 5301.49.
>
> * * *
>
> The General Assembly again amended the Marketable Title Act in 1989 when it enacted the Dormant Mineral Act, Sub.S.B. No. 223, 142 Ohio Laws, Part I, 981, 985-988 * * *, "to provide a method for the termination of dormant mineral interests and the vesting of their title in surface owners, in the absence of certain

occurrences within the preceding 20 years." 142 Ohio Laws, Part I, at 981.

(Second brackets sic.) *Corban* at ¶ 18-19.

**{¶ 21}** However, "[d]ormant mineral interests did not automatically pass by operation of law to the surface owner pursuant to the 1989 law." *Id.* at ¶ 31. Accordingly, the General Assembly further amended the Dormant Mineral Act in 2006 to "provide[] a method for the surface holder to obtain marketable record title to an abandoned mineral interest without having to resort to litigation to have that interest declared abandoned." *Id.* at ¶ 35. "The 2006 amendment to R.C. 5301.56(B) provides that a dormant mineral interest 'shall be deemed abandoned and vested in the owner of the surface of the lands subject to the interest if the requirements established in division (E) of this section are satisfied.' " *Id.* at ¶ 29, quoting 2006 Sub.H.B. No. 288.

**{¶ 22}** The fact that the legislature amended the more general Marketable Title Act to include the Dormant Mineral Act, which provides a distinct process specifically for the termination of mineral interests, strongly suggests that the Dormant Mineral Act should be the controlling law and the exclusive remedy for this discrete class of real-property interests. *See MacDonald v. Cleveland Income Tax Bd. of Rev.*, 151 Ohio St.3d 114, 2017-Ohio-7798, 86 N.E.3d 314, ¶ 27 ("when there is a conflict between a general provision and a more specific provision in a statute, the specific provision controls"), citing Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012) and R.C. 1.51.

**{¶ 23}** However, the continued applicability of the Marketable Title Act in light of the more specific Dormant Mineral Act was not raised as a proposition of law in this appeal, and our review is generally constrained by the arguments raised by the parties. *See State ex rel. Twitchell v. Saferin*, __ Ohio St.3d __, 2018-Ohio-3829, __ N.E.3d __, ¶ 11 (O'Connor, C.J., concurring), citing *Sizemore v. Smith*, 6

Ohio St.3d 330, 333, 453 N.E.2d 632 (1983), fn. 2; *see also State ex rel. Maxcy v. Lucas Cty. Bd. of Elections*, 154 Ohio St.3d 1401, 2018-Ohio-4419, __ N.E.3d __ (DeGenaro, J., dissenting). Given that this question is not squarely before us, we cannot reach its merits. For now, it remains an open issue that is ripe for this court's future review.

**{¶ 24}** Quieting title to severed mineral interests, especially oil-and-gas interests, is a significant matter that impacts the overall economy of this state—especially southeast Ohio. Thus, I write separately to highlight this issue and to stress the narrow scope of our holding today.

_____

Theisen Brock, Daniel P. Corcoran, and Kristopher O. Justice, for appellants.

Stubbins, Watson, Bryan, & Witucky, L.P.A., Mark Stubbins, Kyle S. Witucky, and Grant J. Stubbins, for appellees Carolyn Kohler, Rebecca Englehart, Susan Moore, and Charles Franklin Yontz.

Plunkett Cooney, P.C., and Amelia A. Bower, urging reversal for amicus curiae, Ohio Land Title Association.

_____